STATE of Maine

v.

Eric LEONARD.

Supreme Judicial Court of Maine.

Argued Nov. 17, 1983.

Decided Jan. 6, 1984.

David W. Crook, Dist. Atty., Pamela J. Ames (orally), Asst. Dist. Atty., Augusta, for plaintiff.

Goodspeed & O'Donnell, Joseph M. O'Donnell (orally), Hallowell, for defendant.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, VIOLETTE, GLASSMAN and SCOLNIK, JJ.

McKUSICK, Chief Justice.

On November 8, 1982, the District Court (Augusta), acting pursuant to 12 M.R.S.A. § 7504(6)(D) (1981),[1] ordered defendant Eric Leonard to bring his black bull mastiff ("Tucker") to a game warden to be killed. The Superior Court (Kennebec County) on appeal affirmed the District Court's order and Mr. Leonard now appeals to this court.

---

1. 12 M.R.S.A. § 7504(6)(D) provides in part:

Any person having evidence ... of any dog worrying, wounding or killing any domestic animal, livestock, poultry, fowl or furbearing animal legally in captivity, when the dog is outside of the enclosure or immediate care of his owner or keeper, may present that evidence to the District Court having jurisdiction.

(1) The court may issue a warrant against the owner of the dog, ordering him to show cause why the dog should not be killed.

(2) Upon hearing the evidence in the case, the court may order the dog killed by any game warden.

Finding that the District Court had jurisdiction to order the dog killed and that the court followed applicable procedural requirements, we affirm.

On September 30, 1982, Tucker escaped from the Leonard residence and ran to a neighbor's front yard. There Tucker attacked the neighbor's pet black miniature poodle ("Bonnie"), which was leashed to a runner. In the few seconds that elapsed before Mr. Leonard could extricate Bonnie from Tucker's mouth, she was severely crushed. Although Bonnie was rushed to a local veterinarian, she was pronounced dead on arrival. The veterinarian later indicated that Bonnie died from severe lacerations and massive internal hemorrhaging.

On October 14, 1982, an assistant district attorney moved the District Court to issue a warrant to Eric Leonard to show cause why Tucker should not be killed. This unsworn request, signed by the assistant district attorney, stated the substance of the facts recited above. On October 15, 1982, the District Court granted the request and issued a warrant ordering Mr. Leonard to appear on November 4, 1982, to show cause why Tucker should not be killed. At the November 4, 1982, hearing defendant appeared *pro se* and fully participated. He made no objection to the District Court's jurisdiction over him. The District Court conducted a full evidentiary hearing, at which the State as plaintiff or moving party was required by the court to bear the burden of proof. It presented Bonnie's owner and other live witnesses, and Mr. Leonard testified on his own behalf. In a three-page opinion and order the District Court on November 8 ordered Mr. Leonard to release custody of Tucker to a designated game warden to be killed by intravenous injection by a veterinarian. Subsequently, on November 12, 1982, Mr. Leonard, now appearing through an attorney, moved for stay of execution and for further findings of fact in answer to specific questions, but did not contest the court's personal jurisdiction over Mr. Leonard. On November 16, 1982, the District Court issued a four-page order granting stay of execution pending appeal and in answering the attorney's specific questions stated, *inter alia,* that the proceeding was a civil one in which the State bore the burden of proving its case by a preponderance of the evidence.

I.

At oral argument, this court on its own initiative raised for the first time the question of the District Court's subject matter jurisdiction over this action. This question is prompted by the century-old case of *State v. Harriman,* 75 Me. 562 (1884), which held that a dog is not a domestic animal under a statute that authorized the imposition of substantial criminal penalties (*e.g.,* up to 4 years' imprisonment) for a human being who killed a domestic animal. We conclude that, whether or not *Harriman* has any continuing validity in construing criminal statutes such as the one there involved, it does not control our interpretation of section 7504(6)(D).

In order for the District Court to have subject matter jurisdiction over the State's request for a warrant, it is necessary to find that Bonnie, the miniature poodle that Tucker killed, fell within the statutory category of protected animals: "any domestic animal, livestock, poultry, fowl or furbearing animal legally in captivity." 12 M.R. S.A. § 7504(6)(D). There can be no question but that Bonnie in fact was domesticated within the common meaning of that term. In order to hold that the District Court lacked jurisdiction over this proceeding, it would be necessary to find that the legislature intended to exclude all dogs, as a class, from the range of domestic animals protected by section 7504(6)(D).

There is no reason why the term "domestic animal," as it appears in section 7504(6)(D), should be given anything other than its common meaning. P.L. 1979, ch. 420, which enacted that section, contemplates that a common meaning will be given to this and other terms. For example, section 7001(40) of the same enactment provides that " 'wild animal' means a species of

mammal, wild by nature, whether or not bred or reared in captivity, as distinguished from the *common domestic animals ....* " (Emphasis added) P.L. 1979, ch. 420 is not a mere recodification of prior statutory law. Rather, it is a complete revision of the inland fisheries and wildlife laws, covering 140 pages of the 1979 session laws. Therefore, we give the words of P.L. 1979, ch. 420 their meaning as of 1979. Whatever may have been the case in the nineteenth century, all persons recognize that today household dogs are domesticated. *See* 3A C.J.S. *Animals* § 5 (1973); *Webster's New World Dictionary* 414 (2d ed. 1976). With the possible exception of cats, dogs are now the most common of all domestic animals.

As was said in *People v. Scher,* 55 Misc.2d 754, 286 N.Y.S.2d 770, 772 (N.Y.Crim.Ct. 1968):

[The dog] is the friend and companion of his master and an inmate of his house. It may be said that he was once wild, but so were horses, sheep and cattle. Yet, of all these animals reclaimed by man, the dog alone became domesticated in the home.

The household dog has been trained to answer his master's call and peaceably inhabit the home, and has been groomed and bred to suit the differing preferences of the world's many dog owners and fanciers. In particular, the poodle breed of dogs is domesticated to such an extent that it would be preposterous to contend that a pet poodle is a wild animal.

The wording and evident purpose of section 7504(6)(D) suggest that the term "domestic animal," as used therein, encompasses household pets. It is an accepted canon of statutory construction that some meaning should be attached to all terms unless to do so would lead to illogical results. *See Labbe v. Nissen Corp.,* 404 A.2d 564, 569 (Me.1979); *State v. Tullo,* 366 A.2d 843, 848 (Me.1976). By expressly including "any domestic animal, livestock, poultry,

fowl or furbearing animal legally in captivity," the legislature gave section 7504(6)(D) a broad scope. The separate references to "livestock," etc., indicate that the term "domestic animal" includes animals other than those falling in one of the specifically listed subcategories of domestic animals. Any other reading of this section would render the term "domestic animal" mere surplusage. Household pets are the most obvious example of a domestic animal that is not "livestock, poultry, fowl or other furbearing animal legally in captivity."

P.L. 1979, ch. 420, the legislation enacting section 7504(6)(D), was designed both to provide protection against dangerous dogs and to protect tame dogs from injury or death. For example, P.L. 1979, ch. 420, § 7406(14) provides:

Shooting domestic animals. A person is guilty of shooting domestic animals if, while on a hunting trip or in the pursuit of wild animals or wild birds, he intentionally, knowingly, recklessly or negligently shoots and wounds or kills any domestic animal, including a dog, cat or domestic bird.[2]

Although this section may not define "domestic animal" for all purposes, it demonstrates the legislature's intention to protect dogs from wounding or death.

Other decisional law in this state confirms our conclusion that *Harriman* does not control this question. This court has held that a cat is a domestic animal under a statute permitting a person to kill a dog that worries, wounds, or kills one of his domestic animals. *Thurston v. Carter,* 112 Me. 361, 92 A. 295 (1914). We cannot distinguish *Thurston* from *Harriman* on the basis of some difference in the domesticity of cats and dogs. Many dogs, such as Bonnie, are at least as domesticated as cats. Rather, these cases reflect the particular features and objectives of the statutes there in question. The statute in *Harriman*

---

**2.** This criminal statute, which now defines a Class D crime, 17–A M.R.S.A. § 510(4) (1983), apparently finds part of its ancestry in the criminal statute involved in *State v. Harriman.*

The specification of "dog, cat or domestic bird" was inserted, one can assume, to exclude the restrictive interpretation of "domestic animal" adopted by *Harriman.*

provided up to four years' imprisonment for killing a domestic animal, evidently to deter persons from killing livestock. *Thurston,* like the instant case, involved a statute designed to protect property against dangerous dogs. Like section 7504(6)(D), the interpretation of the statute in *Thurston* implicitly reflects the fact that a dog is a public hazard whether it kills a cat, a dog, or livestock. *See Chapman v. Decrow,* 93 Me. 378, 45 A. 295 (1899) (once a dog no longer threatens the domestic animal, it may not be shot on sight).

In *Harriman* we emphasized that we were narrowly construing the criminal statute there in question. 75 Me. at 565. *Thurston,* by contrast, gave the term "domestic animal" its common meaning. That case extensively surveyed the lexicological and legal thought on the meaning of "domestic animal." Given its common meaning, we concluded that the term "domestic animal" includes household pets because they live "in association with man." 112 Me. at 362, 92 A. at 295. We therefore find nothing in prior law to persuade us that the reference in section 7504(6)(D) to "any domestic animal" does not include a miniature pet poodle.

## II.

Mr. Leonard's sole argument on appeal attacks the adequacy of the procedure by which this action was initiated in the District Court. In effect, he contends that section 7504(6)(D) requires, for the issuance of a warrant to start this action, that a witness with first-hand knowledge of the facts "present" evidence that in form and substance makes out a *prima facie* case for a court order for putting to death the offending dog. He would read the term "evidence" as used in the first sentence of section 7504(6)(D)[3] as meaning evidence in legally admissible form. Obviously, the unsworn statements in the "request for warrant" filed by an assistant district attorney to commence the instant case do not comply with Mr. Leonard's notions of how the statute should be read.

■ We do not, however, find that the construction of the legislative intent expressed in section 7504(6)(D) has any relevance to the decision of this appeal. First, the statutory action authorized by that section is a suit of a civil nature[4] and Rule 1 of the District Court Civil Rules provides:

These rules govern the procedure in all suits of a civil nature in the District Court of the State of Maine with the exceptions stated in Rule 81 [none of which applies here].[5]

Thus, it is not what section 7504(6)(D) prescribes or does not prescribe as the procedure for starting this action that counts.

---

**3.** See n. 1 above.

**4.** The procedure for commencing and conducting any proceeding in the District Court is governed by either the District Court Civil Rules ("all suits of a civil nature") or the District Court Criminal Rules ("all criminal proceedings in which the offense charged is a Class D or Class E crime"), with certain limited exceptions. M.D.C.Civ.R. 1, 81(a); M.D.C.Crim.R. 1, 54(b); *see also* M.R.Crim.P. 1. The breadth of the term "all suits of a civil nature" has been emphasized by the Criminal Code's narrowing of the scope of what is "criminal." *See* 17–A M.R.S.A. §§ 4, 4–A (1983). Section 7504(6)(D) defines no offense committed by a human being, but rather works a forfeiture of a human being's property in a dog that has worried, wounded or killed a domestic animal. *Cf.* 4 C. Wright & A. Miller, *Federal Practice and Procedure* § 1020, at 93 (1969) (forfeiture proceedings are governed by Federal Rules of Civil Procedure).

**5.** The sole exceptions to the applicability of the District Court Civil Rules to "all suits of a civil nature" are:

(1) Actions under the statutory small claims procedure except as incorporated expressly or by analogy in the Maine Rules of Small Claims Procedure.

(2) Ex parte proceedings.

(3) Proceedings for the care, custody, support, and education of neglected children.

(4) Proceedings for commitment or recommitment of insane persons or persons mentally ill.

(5) Actions under the "Uniform Reciprocal Enforcement of Support Act," 19 M.R.S.A. §§ 221–410.

(6) Proceedings in the Juvenile Court. M.D.C.Civ.R. 81(a).

The District Court Civil Rules prescribe commencement of a section 7504(6)(D) case by complaint and summons as any other suit of a civil nature, and that rules procedure is controlling over any procedural provision of the statute. *See* 4 M.R.S.A. § 8 (1979) ("all laws in conflict [with promulgated procedural rules] shall be of no further force or effect").

■ Second, even though the case at bar was not commenced either by complaint and summons as provided by M.D.C.Civ.R. 3 or by the presenting of "evidence" of the quality Mr. Leonard now would insist upon, he has not preserved any objection to the way the action was started. He appeared generally in the District Court for the evidentiary hearing held on November 4, 1982, and he participated fully therein. He thus submitted himself to the personal jurisdiction of the District Court and waived any objection to the proceeding on that score. *See* M.D.C.Civ.R. 12; M.R.Civ.P. 12(b)(1). *See, e.g., Bowman v. Dussault,* 425 A.2d 1325 (Me.1981) (defense of improper service of affidavit waived unless service objected to); *United States v. Fishing Vessel Mary Ann,* 466 F.2d 63 (5th Cir.1972), *cert. denied,* 410 U.S. 929, 93 S.Ct. 1365, 35 L.Ed.2d 590 (1973) (personal jurisdiction defense waived if no objection presented). As we have held in part I of this opinion, the District Court had subject matter jurisdiction granted it by section 7504(6)(D). On November 4, 1982, the District Court judge heard the full evidence both from Mr. Leonard and from Bonnie's owner and other neighbors. On November 8 the judge issued a three-page opinion and order thoroughly setting forth his findings of fact and conclusions of law. Eight days later, after counsel for Mr. Leonard had, for the first time, filed his appearance, the judge filed a further four-page order specifically responding to questions posed in the attorney's motion for further findings. Whatever the technical shortcomings of the procedure by which this case was commenced, Mr. Leonard received notice of the nature of the claim that was being made against him and of the relief sought against his property, and he joined issue without restriction at the hearing of November 4. Having made no timely objection in the trial court to the way in which the case was commenced, he has preserved no argument that an appellate court will entertain. *See Blanchette v. York Mutual Insurance Co.,* 455 A.2d 426 (Me.1983); M.R.Civ.P. 46.

Mr. Leonard was given his full day in court. Notably, he does not argue the contrary on appeal; he does not suggest that he has not had a complete and fair trial of this civil controversy. He argues only technical deficiencies in the commencement of the action. Those contentions come much too late.

The entry is:

Judgment affirmed.

All concurring.